William E. FRANK, District Director of Bureau of Internal Revenue for the District of Washington, Appellant,

v.

INTERNATIONAL CANADIAN CORPO-RATION and Pennsalt Chemicals Corporation, Appellees.

No. 17545.

United States Court of Appeals Ninth Circuit.

Sept. 19, 1962.

John B. Jones, Jr., Acting Asst. Atty. Gen., Lee A. Jackson, Gilbert E. Andrews, Arthur I. Gould, and C. Moxley Featherston, Attys., Dept. of Justice, Washington, D. C., and Brockman Adams, U. S. Atty., Tacoma, Wash., for the appellant.

Eisenhower & Carlson, and John J. Reha, Jr., Tacoma, Wash., Anderson, Rush, Ward & Dean, and Stephen T. Dean, Orlando, Fla., Montgomery, McCraken, Walker & Rhoads, and Frank S. Deming, Philadelphia, Pa., for the appellee.

Before BARNES and JERTBERG, Circuit Judges, and BOWEN, District Judge.

BARNES, Circuit Judge.

This appeal involves federal income taxes of two corporations. From which is the government entitled to collect? One has, by law, a preferential income tax basis over the other.

Plaintiff-appellee International Canadian Corporation (hereinafter referred to as "International") paid $84,692.91 in taxes as reported on its timely return for its fiscal year ending April 30, 1953; defendant-appellant Frank (hereinafter referred to as "Commissioner") then assessed a deficiency of $97,462.18 for the same taxable year and International paid the deficiency on October 3, 1956. On October 29, 1956, plaintiff-appellee Pennsalt Chemicals Corporation (hereinafter referred to as "Pennsalt") paid a deficiency of $147,943.81 assessed by the Commissioner on Pennsalt's taxable year ending December 31, 1952. Both corporations filed claims for refund on March 20, 1957; on May 20, 1957, International filed an amended claim for refund.

The claims were not formally rejected by the Commissioner, but a six-month period had elapsed before these actions were begun. The timely actions in the district court for recovery of the taxes paid were consolidated for trial. The district court had jurisdiction under the provisions of Section 1346 of Title 28, United States Code. Judgments for the corporations were entered on April 13, 1961; an amended judgment was entered on August 2, 1961. The Commissioner filed a timely notice of appeal. This court, therefore, has jurisdiction to review the judgments entered below under the provisions of Section 1291 of Title 28, United States Code.

The principal questions presented are (1) whether International qualifies as a Western Hemisphere trade corporation entitling it to a favorable status under the Internal Revenue Code of 1939, and (2) whether the tax returns of the corporations for the years in question correctly reflect their incomes.

I FACTS

Pennsalt is a Pennsylvania corporation having its principal place of business in Philadelphia; until April 24, 1957, it had been known as the Pennsylvania Salt Manufacturing Company.

Pennsylvania Salt Manufacturing Company of Washington (hereinafter referred to as "Washington") was a Washington corporation having its principal place of business in Tacoma. All of the outstanding common stock of Washington was owned by Pennsalt. On June 29, 1956, Washington was merged into Pennsalt; and, therefore, Pennsalt, the surviving corporation, is entitled to any refund due, or is liable for any obligation of, Washington.

International was incorporated under the laws of Washington on May 9, 1952. Prior to June 29, 1956 (when Washington was merged into Pennsalt), Pennsalt held all International's outstanding (1,000 shares) preferred stock; and Washington held all International's outstanding (10 shares) common stock.

Since 1930, Washington had sold liquid chlorine and liquid caustic soda to the British Columbia Pulp and Paper Company, Ltd. (hereinafter referred to as "British Columbia"), Washington's principal Canadian customer whose plants at Port Alice, Vancouver Island, and Woodfibre, British Columbia, could be reached by water transportation only. In May 1951, Alaska Pine Company, Ltd. (hereinafter referred to as "Alaska Pine") bought British Columbia and renamed it Alaska Pine and Cellulose, Ltd.

The liquid chlorine and the liquid caustic soda that Washington sold to British Columbia, and later to Alaska Pine, are produced in a single process which yields 47% chlorine and 53% caustic soda. The single process is a continuous one. Any shutdown results in a severe economic loss. And the chlorine being an injurious gas, must be stored pending sale. The storage capacity of Washington's Tacoma plant was, however, limited to one hundred and fifty tons. Washington had a daily production capacity of one hundred and thirty tons.

One-ton containers were used to ship the liquid chlorine to British Columbia and to Alaska Pine. Due to Washington's limited storage capacity, it was essential that there be an equal distribution of the one-ton shipping containers; i. e., one-third should be in transit; a second one-third of the containers should be at the British Columbia (or now Alaska Pine) plants being unloaded (and providing Alaska Pine with raw material so that its plant operations, which are also a continuous process, would not be forced to shut down); the final one-third should be in Tacoma being reconditioned, inspected, and made available for the loading of chlorine so that Washington's plant would not be forced to shut down due to a lack of storage facilities. The responsibility for the equal distribution of shipping containers after 1946 rested with British Columbia or Alaska Pine and the Waterhouse Company of Canada, Ltd. (hereinafter referred to as "Waterhouse"); Waterhouse provided the wa-ter shipping facilities between Washington's Tacoma plant and British Columbia or Alaska Pine's Canadian plants. During the early 1950's, however, equal distribution of the shipping containers was not maintained because: (1) British Columbia and Alaska Pine did not have a traffic department, (2) Waterhouse did not maintain a regular shipping schedule for the chlorine since there were not enough shipments to warrant a regular schedule, (3) Waterhouse would frequently abandon the containers to make room for more profitable cargo, and (4) damaged shipments of caustic soda resulted in friction between Waterhouse and the new Alaska Pine personnel. These problems, in turn, caused problems for Washington—it had to pay overtime wages for the unloading of Waterhouse ships which arrived without notice on weekends and after normal working hours; it had to pay for the repair of containers which Waterhouse had abandoned in strange ports; and it had labor problems because its employees objected to spending their hours after normal working hours and during the weekends waiting for Waterhouse ships to arrive.

By 1952, it became clear that changes were needed in the manner in which the chlorine and the caustic soda products were being shipped by Washington to Alaska Pine. Washington, however, did not want to assume the supervision and responsibilities for shipments to Alaska Pine. To do so, feared Washington, would violate the most favored nation clause in its customer contracts and would violate prohibitions against discrimination contained in the Robinson-Patman Act. These fears led Washington to the conclusion that sales to Alaska Pine should be made by a new and separate corporation which would assume the shipping responsibilities by taking and retaining title to the chemical products until they were delivered in Canada. After Washington had decided to form a new and separate corporation, Penn-salt (then Washington's parent corpora-

tion) suggested that the new corporation be formed as a Western Hemisphere trade corporation.

The new corporation, International, filed articles of incorporation, which were approved by the Secretary of State of the State of Washington on May 9, 1952. For its fiscal year beginning May 9, 1952 and ending April 30, 1953, International's gross income came solely from the sale of liquid chlorine and liquid caustic soda to Alaska Pine under a five-year written contract which had been executed in International's behalf on May 6, 1952. The May 6th contract stated that in the case of C.I.F. shipments title should pass from seller to buyer at the buyer's docks or railroad grids located in British Columbia. All of International's invoices stated that sales from it to Alaska Pine were on an F.O.B. destination or a C.I.F. basis. And it was found that the title of all goods sold by International to Alaska Pine passed in Canada.

International had its own invoices, letterheads, and employer social security number; it maintained separate books of account and it maintained its bank account at a bank different from that used by Washington; it underwent a separate annual audit by certified public accountants and it filed separate corporate income tax returns. And it had officers and directors differing from those of Washington; its officers and directors did, however, hold official positions with either Washington or Pennsalt.

International paid one employee, Mr. Nielson, directly. Mr. Nielson was responsible for International's administrative work. The work consisted of maintaining International's books and records; reviewing all paper work done by the personnel of Washington who had been assigned to assist him; preparing export declarations and customs papers; handling correspondence; and coordinating instructions received from Alaska Pine with Washington's traffic, production, and shipping departments. During its first year of operation, International paid Washington $100 a month for the assistance and facilities provided by Washington; after the first year was completed, a study was made and International's monthly payment to Washington was increased to $200.

After 1952, International paid Dr. William Cooper a fee to study the possibility of expanding International's business in the Canadian market.

The price which International paid Washington for the liquid chlorine and the caustic soda included (1) all the direct costs incurred by Washington in the production of the two products, (2) a full allocation of manufacturing overhead, (3) the delivery charges on the two products, and (4) a six per cent markup on the total of the first three items.

## II TAX ASSESSMENTS

The Commissioner made assessments against both International and Pennsalt on alternative theories; i. e., International was taxed on the income which it reported but not as a Western Hemisphere trade corporation, and Pennsalt was taxed on the income which International reported on the theory that all of International's income should be attributed to Pennsalt, the parent corporation.

The district court concluded—

(1) That having received all of its income from sales outside the United States and having derived all of its income from the conduct of an active trade or business, International qualified as a Western Hemisphere trade corporation under § 109 of the Internal Revenue Code of 1939, 26 U.S.C.A. § 109;

(2) that none of the income reported by International was attributable to Washington under § 22(a) of the Internal Revenue Code of 1939, 26 U.S.C.A. § 22(a); and

(3) that Washington received "a reasonable return" on its manufacturing activity when it sold its goods to International at a price which reflected the direct cost of manufacturing, manufacturing overhead, and delivery expenses, plus an additional six per cent of the total of the three items.

The district court then held that International was entitled to recover $97,-433.86, plus interest from October 3, 1956; and that Pennsalt was entitled to recover $147,943.81, plus interest from October 29, 1956. The Commissioner takes this appeal from judgments entered accordingly.

## III SPECIFICATIONS OF ERRORS

The Commissioner urges three questions on appeal.[1] These questions, in the Commissioner's words, are that—

"1. The District Court erred in holding that International * * * derived 90 per cent or more of its gross income for the taxable period under review 'from the *active conduct* of a trade or business' within the meaning of Section 109(b) of the Internal Revenue Code of 1939 so as to qualify as a Western Hemisphere trade corporation.

"2. The District Court erred in holding that the income reported by International * * * was not attributable to Pennsalt * * *.

"3. The District Court erred in failing to reallocate income reported by International * * * for the taxable period under review to its parent, Pennsalt * * *, pursuant to the provisions of Section 45 of the Internal Revenue Code of 1939, to reflect a markup on sales by the parent to the subsidiary which would have resulted from bargaining between parties *dealing at arm's length.*

"a. The District Court did not apply the proper standard *(arm's length bargaining)* for determining whether income reported by the subsidiary properly should have been allocated to the parent; instead, it viewed the transaction between the parent and subsidiary only in light

of whether the former received a *'reasonable rate of return.'*

"b. The District Court erred in holding that the price at which chemicals were sold by the parent to the subsidiary, the sum of direct cost of manufacturing, manufacturing overhead, delivery charges and a six per cent markup thereon, was a reasonable sales price resulting in a *'reasonable rate of return.'*

"c. The District Court erred in failing to consider that the parent corporation utilized a markup in excess of 100 per cent on its sales to third party purchasers; it should have reallocated income between the parent and the subsidiary utilizing the same markup percentages as that used on sales made to other purchasers which dealt with the parent corporation at arm's length in the absence of any showing by taxpayers justifying a different reallocation." (Emphasis added.)

## IV DID INTERNATIONAL QUALIFY AS A WESTERN HEMISPHERE TRADE CORPORATION WITHIN § 109(b) OF THE 1939 CODE?

Section 109 of the Internal Revenue Code of 1939 reads in pertinent part as follows:

"§ 109. Western hemisphere trade corporations

"For the purposes of this chapter, the term 'western hemisphere trade corporation' means a domestic corporation all of whose business is done in any country or countries in North, Central, or South America, or in the West Indies, or in Newfoundland and which satisfied the following conditions:

"(a) If 95 per centum or more of the gross income of such domestic corporation for the three-year period immediately preceding the close

---

1. The Commissioner's brief contains a "Statement of Points to Be Urged" rather than a statement of the specific errors which he relies upon in this court as is required by Rule 18, subd. 2(d) of this court, 28 U.S.C.A.

of the taxable year (or for such part of such period during which the corporation was in existence) was derived from sources other than sources within the United States; and

"(b) If 90 per centum or more of its gross income for such period or such part thereof was derived from the active conduct of a trade or business." (26 U.S.C. § 109, 1952 Ed.)

The issue in the district court was whether International (1) received 95% or more of its gross income from sources outside the United States, and (2) whether 90% or more of the same income was derived from the active conduct of a trade or business during the taxable year under review. The district court, as stated, held that International qualified as to each requirement.

Only one requirement is now urged by the Commissioner as having been erroneously decided in the district court. That is, the Commissioner here urges that this court reverse the district court "on the grounds that * * * International failed to meet one of the prerequisites for qualification * * * [I]t did not derive its income from the

*active conduct* of a trade or business." (Emphasis added.)

From a citation to the Senate Finance Committees' Report[2] the Commissioner concludes that Congress intended to deny the tax advantages available to § 109 corporations "to domestic corporations which derived their income from *passive activities*, a non-competitive course of conduct, as in the case at bar." (Emphasis added.) And, contends the Commissioner, the most that can be said for International's role in this case "is that it was a mere conduit for income attributable to the activities of Washington." Then the Commissioner proceeds to make much of certain facts.

The undisputed facts, urges the Commissioner, show that International was "inert;" and, therefore, it was clear error for the district court to hold that International was actively engaged in a trade or business.

The meaning which the Commissioner contends should be given "active conduct" as used in § 109(b) is, however, contrary to a majority of the authorities. The "active conduct" requirement of § 109(b) is to disqualify corporations which are "inactive" in the sense that they receive investment income rather than business income.[3] And since all

---

2. The Commissioner's citation from S.Rep. No. 1631, 77th Cong., 2d Sess., p. 82 (1942-2 Cum.Bull. 504, 532) reads:

"American corporations trading in foreign countries within the Western Hemisphere are placed at a *considerable competitive disadvantage* with foreign corporations under the tax rates provided by the bill. To alleviate this competitive inequality, the committee bill relieves such corporations from surtax liability. To obtain this relief 95 per cent of the gross income of such companies must be from sources outside the United States. Moreover, *90 per cent of their income must be from the active conduct of a trade or business.*" (Emphasis the Commissioner's.)

3. "The term 'active conduct of a trade or business' is also used in § 251. 'The object of the law, obviously, is to prevent a corporation from obtaining the Western Hemisphere trade corporation credit on investment income.' P.-H. Fed. Tax

Service, 1953, Vol. I, Par. 4686. That is the object of 26 U.S.C.A. § 109 as well." Towne Securities Corp. v. Pedrick, 53-2 USTC Par. 9585, p. 48, 601, 44 AFTR 1258 (D.C.N.Y.1953).

"The test for qualification as a Western Hemisphere trade corporation is in terms of gross income derived from the active conduct of a trade or business. Interest and dividend income do not meet the test. Income from sales activities, however, is income from the active conduct of a trade or business, and the source of sales income is without the United States if the place of sale is outside the United States." Mertens, Law of Federal Income Taxation (Zimet Revision), Vol. 8, § 45.76, p. 205 (omitting cases cited in notes).

"The fourth requirement, *i. e.*, 90 percent of gross income derived from the *active* conduct of a business, has never presented many problems of interpretation. The object of the law obviously is to prevent a corporation from obtaining

International's income came from the sale of chemical products, more than 90% of its gross income "was derived from the active conduct of a trade or business" within the meaning of § 109 (b).

The Commissioner's argument that International was inactive—or, "inert"—is based on his contentions that (1) Washington had been doing business with Alaska Pine and its predecessor for over twenty years; (2) Washington, not International, performed all the activities "necessary" to the sale of chemicals; and (3) International could not conduct any sales activities since it had no source of supply, customers, plant or employee organization. We consider each in turn.

First, the Commissioner argues that because Alaska Pine and its predecessor had been doing business with Washington for over twenty years, International did not actively conduct a trade or business. This argument is without merit.

The Commissioner advanced a similar contention in Polak's Frutal Works, Inc., 1954, 21 T.C. 953. The Tax Court denied the Commissioner's contention that income should be allocated between the different entities pursuant to either § 22 (a) or § 45 of the Internal Revenue Code after having made the following findings of fact:

"After formation of Export, the same customers formerly served by Frutal were then served by Export and later Export, Inc. The same sales agents were used as had formerly been used by Frutal. The list of Frutal's export customers was turned over to the export entity, as well as files relating to the export trade.

"After Export was formed, it wrote letters to all of Frutal's former agents, advising that any agreements between the agents and Frutal would remain unchanged except

the Western Hemisphere Trade Corporation credit on investment income." Terence M. Flynn, Western Hemisphere

that the partnership 'will be substituted' for Frutal. In an accompanying letter, Frutal advised these same agents that there would be no changes in price policies, quality or merchandise, or in the manner of packing and labeling the products. Frutal further advised that '* * the transfer of all existing contracts between ourselves and you will merely involve the substitution of the name of Frutal Export Company to effect the contractual relationship between yourselves and the new company.'" 21 T.C. at 966–967.

■ The district court's findings of fact show that Washington had good business reasons for forming International (as a Western Hemisphere trade corporation or otherwise) to handle sales with Alaska Pine. To qualify as a Western Hemisphere trade corporation, the business of the qualifying corporation need not be restricted to new business developed after its incorporation; i. e., it cannot be said that a Western Hemisphere subsidiary cannot be formed to take over business previously done by its parent organization. Polak's Frutal Works, Inc., supra; see also A. P. Green Export Co. v. United States, Ct.Cl., 1960, 284 F.2d 383.

■ Secondly, the Commissioner contends that International was not active within the meaning of § 109 because Washington performed all the activities necessary to the sale of chemicals; i. e., Washington paid certain persons who opened International's mail, typed order blanks for International, and sent one copy of the order to the shipping department and another copy to the invoicing clerk. The Commissioner advanced a similar argument in A. P. Green Export Co. v. United States, supra, but the Court of Claims there held that merely because the parent corporation's employees performed all of the subsidiary's work did

Trade Corporations: Quo Vadis?, 12 Tax L.Rev. 413, 419 (1956–1957).

not, *in and of itself*, disqualify the subsidiary as a Western Hemisphere trade corporation. In addition, International, in the case at bar, employed and paid Mr. Nielson who not only kept International's books but also reviewed all paper work, prepared export declarations and customs papers, handled correspondence, and coordinated instructions received from Alaska Pine with Washington's traffic, production, and shipping departments. Moreover, as in the A. P. Green Export case, supra, International here paid a monthly management fee to Washington, part of which was in payment for the routine services which Washington performed for International and which were not paid for in other ways.

The Commissioner does not show where the district court was clearly erroneous; nor does he answer the cases above cited by the district court and the appellee, which support the judgment below.

■ Lastly, the Commissioner argues that International could not conduct any sales activity since it had no source of supply, customers, plant or employee organization. As has been shown, a parent organization can transfer its selling operations to a subsidiary and the subsidiary can still qualify as a Western Hemisphere trade corporation within § 109. A. P. Green Export Co. v. United States, supra; Barber-Greene Americas, Inc., 1960, 35 T.C. 365; Polak's Frutal Works, Inc., supra.

The Commissioner cites no statutes, regulations, or cases which require a corporation to own, rather than to rent, office space. Nor was there here reason for International to own warehouse space. And though Washington owned the one-ton shipping containers, Washington was compensated for their use since a container charge was part of the cost of sales on which International paid a six per cent profit to Washington. The Commissioner shows no error in law or fact in the district court's judgment. The district court cannot, therefore, be held to have committed error when it re-jected this argument of the Commissioner.

Therefore, even if the Commissioner was not contending for an erroneous interpretation of the term "active conduct" as used in § 109(b), the facts fully support the district court's judgment that International qualified within the meaning of § 109(b).

## V SHOULD INTERNATIONAL'S INCOME BE TAXED TO WASHINGTON?

■ The Commissioner contends that International's entire income should be taxed to Washington because International was inactive and performed no services. The Commissioner's contention is without merit. That which has been said above shows clearly that International was not "inactive."

The facts also show clearly that International earned its income by performing services. International resolved shipping problems with Alaska Pine; it handled all the export declarations and customs papers; it incurred and paid $124,814.72 in freight charges; it was studying the possibility of expanding its business in Canada. In the words of the district court:

> " * * * in entire good faith International was organized as a corporation and at all times operated as a bona fide separate entity engaged in substantial and legitimate business activities from which its gross income was derived."

That finding is supported by the evidence, and is not clearly erroneous.

## VI SHOULD INTERNATIONAL'S INCOME BE REALLOCATED TO PENNSALT UNDER § 45 BECAUSE PENNSALT SOLD TO INTERNATIONAL AT UNREASONABLE PRICES?

The Commissioner contends that if this court finds no error in the district court's determination that Washington cannot be taxed on the entire income of International, then the district court was in error in failing to apply § 45 of the

Internal Revenue Code of 1939 to increase the price of the products sold by Washington to International. The district court's error, contends the Commissioner, is that it used "reasonable return" as the standard to evaluate the price actually charged; whereas, contends the Commissioner, the district court should have evaluated the price by the standard of "arm's length bargaining."

We might well find that the Commissioner stipulated himself out of court on this issue. The Pretrial Order states that upon admitted facts (Tr. p. 30) the district court "may find (Tr. p. 34) any one of the following to be the ultimate conclusions of fact and law in this case." [4]

Each of the four alternate ultimate conclusions referred to "a *reasonable price and profit*" as between the two corporations, or to "a reasonable price." (Emphasis added.)

The trial court followed the Pretrial Order, and made specific findings on the reasonableness of the intercompany markup,[5] and proper conclusions of law therefrom.[6]

■ The Commissioner now departs from the Pretrial Order and urges a standard different from that stipulated to by the parties ("a reasonable price and profit") and different from that used by the district court. This he cannot do. Ringling Bros.-Barnum & Bailey Combined Shows, Inc. v. Olvera et al., 9 Cir. 1941, 119 F.2d 584, 586. There was no request for amendment or modification of the order at time of trial. Fowler v. Crown-Zellerbach Corporation, 9 Cir. 1947, 163 F.2d 773, 774.

■ But entirely aside from appellees' position that the Commissioner is precluded from advancing this argument on appeal, we do not agree with the Commissioner's contention that "arm's length bargaining" is the *sole* criterion for applying the statutory language of § 45 in determining what the "true net income" is of each "controlled taxpayer." Many decisions have been reached under

4. "International and Pennsalt have both been taxed by the Commissioner of Internal Revenue on the same net income arising from the sales in the name of International. The Court may find any one of the following to be the ultimate conclusions of fact and law in this case. Pursuant to such findings the parties, if the Court agrees, will mutually determine the applicable refunds to which one or both plaintiffs will be entitled and will only resort to the Court for aid in the event such computations cannot be mutually agreed upon:

"(a) International is a bona fide Western Hemisphere Trade Corporation for tax purposes and is or is not entitled to the surtax exemption under Section 15 (b). The cost of goods from Washington reflects a reasonable price and profit as between the two corporations.

"(b) International is a bona fide Western Trade Corporation for tax purposes and is or is not entitled to the surtax exemption under Section 15(b). However, the cost of goods from Washington must be increased to $........ in order to reflect a reasonable price and profit as between the two corporations. Said dollar amount being an over-all mark-up of ......% on Washington's cost of goods sold to International.

"(c) International is not a Western Hemisphere Trade Corporation but is a bona fide corporation for tax purposes and the cost of goods from Washington reflects a reasonable price and is or is not entitled to the surtax exemption under Section 15(b) and the excess profits credit under Section 431.

"(d) International is not a Western Hemisphere Trade Corporation but is a bona fide corporation for tax purposes and is or is not entitled to the surtax exemption under Section 15(b) and the excess profits credit under Section 431. However, the cost of goods from Washington must be increased to $......... in order to reflect a reasonable price and profit as between the two corporations. Said dollar amount being an overall mark-up of ......% on Washington's cost of goods sold to International.

"(e) International is not a bona fide corporation for tax purposes."

5. Findings Numbers 46 and 47. Tr. p. 64.

6. Conclusion Number 6. Tr. p. 65-6.

§ 45 without reference to the phrase "arm's length bargaining" and without reference to Treasury Department Regulations and Rulings which state that the talismanic combination of words— "arm's length"—is the "standard to be applied in every case." [7]

For example, it was not any less proper for the district court to use here the "reasonable return" standard than it was for other courts to use "full fair value," [8] "fair price, including a reasonable profit," [9] "method which seems not unreasonable," [10] "fair consideration which reflects arm's length dealing," [11] "fair and reasonable," [12] "fair and reasonable" or "fair and fairly arrived at," [13] or "judged as to fairness," [14] all used in interpreting § 45.

Assuming, then, that the district court did not apply an erroneous standard in evaluating the price charged International by Washington (and that the Commissioner is not precluded from raising the issue in this court), the next question is whether the district court erred as a matter of fact in determining that sales to the subsidiary corporation must be at a price which was comprised of direct manufacturing costs, manufacturing overhead, and delivery expenses, plus six per cent on the total of the three items and that such sales constituted a reasonable return to Washington within the meaning of § 45.

The Commissioner asserts error because (1) Washington had a markup on all sales from all plants of approximately one hundred per cent, whereas the markup on its sales to International was six per cent; and (2) Washington performed order processing, packaging, loading, shipping and sales services and supplied office space to International for $100 a month.

■ Did the district court err in holding the six per cent markup to be a reasonable profit? Not in our opinion. The Commissioner only estimated Washington's markup on other sales; he does not show Washington's markup on the *two* products which it sold to International to be any different from Washington's markup on the sale of the same *two* products to other customers.[15] Washington sold may other products.[16] The Commissioner presents no record evidence showing the profit margins for Washington's different products. Indeed, the Commissioner cannot show record evidence of these profit margins, for he did not inquire into this matter at the trial.

What was said in Polak's Frutal Works, Inc., supra, seems applicable here. There the parent organization

---

7. Treasury Regulations 118, Section 39.-45–1(b) (1).

8. The Friedlander Corp., 1955, 25 T.C. 70, 77.

9. Grenada Industries, Inc., 1951, 17 T.C. 231, 260, affirmed 5 Cir., 202 F.2d 873, certiorari denied, 346 U.S. 819, 74 S.Ct. 32, 98 L.Ed. 345.

10. Motor Securities Co., Inc., 1952, 11 TCM 1074, 1082.

11. Palm Beach Aero Corp., 1952, 17 T.C. 1169, 1176.

12. Polak's Frutal Works, Inc., supra, 21 T.C. at 975–976.

13. Seminole Flavor Co., 1945, 4 T.C. 1215, 1232.

14. Ibid., 4 T.C. at 1233. And cf: "Whether any such business agreement would be entered into by total strangers is wholly problematical." Idem, p. 1233.

15. It is true that prices to individual buyers were not the same (Tr. p. 209). Whether Washington favored International or not was not disclosed.

16. In addition to the liquid chlorine and the liquid caustic soda it sold to International, Washington also sold solid, flake, and crystal caustic soda; sodium phosphate detergents; hydrogen gas; sodium hypochloclorite; sodium orthosilicates; blended cleaning compounds; lindane blends; inhibited muriatic acid; DDT; sodium chlorate; potassium chlorate; and defoliating compound.

sold its manufactured product to its controlled sales organization; the intercompany sale price was comprised of direct cost of materials, and a percentage of the manufacturing costs for the products sold to the sales organization, plus ten per cent of the sum of the two items. During the same period, the parent had an average markup of one hundred and eleven and eight tenths per cent and its sales organization had an even higher markup. The Commissioner there contended that the intercompany sales price was unreasonably low and sought to adjust the price, under § 45, to what he considered to be reasonable prices. The court there said:

> "All probative evidence of record is to the effect that Frutal received from the export entities what would be considered in the trade of which it was a part as fair and reasonable prices for its services. Respondent [the Commissioner] offers no countervailing evidence. Nor does he say what, in his opinion, would constitute such fair and reasonable price. Rather, he would arbitrarily allocate each year whatever percentage of income of the export entity involved is sufficient to bring Frutal's earnings to approximately the level they held in the years prior to the organization of Export.

> "As was said in Seminole Flavor Co., 4 T.C. 1215, 1235: 'Actually, the principal force behind all of the Commissioner's argument is that the petitioner could as well have done all the things that the partnership did and reaped all of the earnings of the related enterprises. Since petitioner could have had the earnings, the Commissioner would make it so by exercising the authority conferred by section 45 * * *' Such argument we there rejected. See also Miles-Conley Co., 10 T.C. 754. Moreover, a similar argument was disposed of in Koppers Co., 2 T.C. 152, with the following language, which is also apposite here after due allowance is made for factual differences:

> " 'The answer, however, to this argument is that petitioner did not do this. It was free to and did use its funds for its own purposes. It was under no obligation to so arrange its affairs and those of its subsidiary as to result in a maximum tax burden. On the other hand, it had a clear right by such a real transaction to reduce that burden. Helvering v. Gregory, 293 U.S. 465 [55 S. Ct. 266, 79 L.Ed. 596]; Chisholm v. Commissioner [2 Cir.], 79 Fed.(2d) 14; Commissioner v. Gilmore['s] Estate, 130 Fed.(2d) 791; Coca-Cola Co. v. United States [D.C.], 47 Fed. Supp. 109; Commissioner v. Kolb [9 Cir.] 100 Fed.(2d) 920.' " (21 T.C. at 976.)

The Commissioner's asserted error regarding International's payment of $100 a month for Washington's services of processing, packaging, loading, shipping and sales services, and for office rental is equally untenable. Packaging, loading and shipping was part of the delivery charge and manufacturing costs, upon which Washington was not only reimbursed but also received a six per cent profit.[17] The $100 a month (which was later increased to $200 a month) paid by International to Washington was a management fee to compensate Washington for the administrative services and office facilities provided to International. The Commissioner did not dispute the reasonableness of this fee below, nor on his statement of points, nor errors urged. He cannot do so now. Williams v. Dodds, 9 Cir.1947, 163 F.2d 724. In any event, the Commissioner does not demonstrate that it was clearly erroneous for the district court to hold the fee to be reasonable.

Finding no error on any of the grounds urged, we affirm.

---

17. Compare: Pan American Entectic Welding Alloys Co.. Inc., 36 T.C. 284 (1961), where sales price was "7% above cost."